UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    Case No. 1:05:CR:69

JEROME LEWIS,                      HON. GORDON J. QUIST

      Defendant.

_____/

## OPINION

Defendant, Jerome Lewis ("Lewis"), has been charged with six counts of possession with intent to distribute cocaine, heroin, and marijuana in violation of 21 U.S.C. § 841(a)(1); two counts of possession of a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. §§ 924(c); two counts of distribution of cocaine and heroin in violation of 21 U.S.C. § 841(a)(1); and one count of distribution of heroin resulting in serious bodily injury in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).  Lewis has filed a motion to suppress evidence seized during a search of his vehicle on February 17, 2005, and a motion to suppress evidence seized from 7146 Lodge Pole Drive on March 22, 2005.  The Court heard testimony from Government witnesses on November 21, 2005. Following the hearing, the Government filed a supplemental brief addressing:  (1) the legal impact, if any, of the fact that the drug-sniffing dog leapt through the open window of Lewis' car; (2) the factual significance of Lewis' direction of travel at the time of the stop; and (3) the applicability of the Sixth Circuit's recent decision in United States v. Davis, No. 03-1451, 2005 WL 3108503 (6th

Cir. Nov. 22, 2005).  Although granted the opportunity to do so, Lewis did not file a brief on these issues.  The Court's findings of facts and conclusions of law are set forth below.

### Findings of Fact

On February 17, 2005, at approximately 4:20 a.m., Officer John McCaw of the Wyoming Police Department was on patrol and noticed a vehicle, a maroon Plymouth, parked toward the back of the driveway of 141 44th Street,  S.W., with its lights on.  Sergeant McCaw was familiar with the residence as a drug house, based upon his own and other officers' prior experience with the residence as well as its occupants, Paula Nice ("Nice") and her boyfriend, Shawn Harper ("Harper").  Sergeant McCaw had been a supervisor in the Wyoming Area Narcotics Team ("WANT") until the fall of 2004, when it was disbanded due to funding issues.

On February 17, 2005, Sergeant McCaw had the following information about Nice, Harper, and 141 44th St Street, S.W.:

(1)      Sergeant McCaw and other Wyoming Police Officers had received several in-person tips from one or more confidential informants and several phone tips from one or more anonymous callers stating  that Nice and Harper were dealing and using various drugs, including marijuana and cocaine.  The tip information received prior to the fall of 2003 indicated that Nice was living and dealing out of the residence at 4056 Stafford, but after that time the informants stated that Nice and Harper were residing at 141 44th St, S.W. and dealing out of that residence.  Both the anonymous and confidential tip information stated that there was traffic at 141 44th St. S.W. both day and night and that customers used the back door of the residence.

(2)      In July 2003, Wyoming police had found Nice in possession of a Trinidad AT-9 rifle with an ammunition magazine with a 50-round capacity with between 30 and 40 9mm rounds loaded in the magazine.

(3)      On July 15, 2004, members of the WANT team and another area drug unit conducted surveillance of 141 44th St., S.W., based upon information that the residents, Nice and Harper, were dealing large amounts of marijuana.  Police officers stopped Harper's vehicle for a traffic violation after it left the residence and arrested Harper

2

for possession of heroin. Following Harper's arrest, Nice consented to a search of 141 44th St., S.W., which yielded, among other things, a digital scale, a gallon-sized bag of marijuana, and suspected heroin residue. In an interview conducted on July 16, 2004, Nice stated that Harper had sold multi-pound quantities of marijuana, that Harper currently used heroin, and that Nice had sold 1 to 2 pound quantities of marijuana for a period of time.

(4)    Sergeant McCaw was aware that the Grand Rapids Police Department and the Drug Enforcement Administration were investigating Nice's and Harper's involvement with drug sales and that, after the WANT team was disbanded, he continued to receive inquiries from an anonymous caller about the status of the investigation of Nice's and Harper's activities at 144 44th St., S.W.

Given his familiarity with 144 44th Street, S.W. and its residents, Sergeant McCaw suspected that the person connected with the vehicle was engaging in a drug transaction. Sergeant McCaw saw the vehicle pull out of the driveway and turn onto 44th Street without stopping. He also noticed that the license plate on the car was not illuminated, as required by the Michigan Vehicle Code. Sergeant McCaw followed the vehicle as it proceeded west on 44th Street toward U.S. 131. Initially, the vehicle went into the right lane for the northbound entrance onto U.S. 131, but it switched to the right through lane and continued west over the highway. After the vehicle crossed over U.S. 131, Sergeant McCaw initiated a traffic stop in the parking lot of a Denny's Restaurant on the north side of 44th Street. Sergeant McCaw identified the driver as Lewis.

During the stop, Lewis stated that he was on his way home to 950 Woodfield East Dr., S.E., from his friend Paula's house, although he was traveling in the opposite direction. As he was questioning Lewis, Sergeant McCaw observed an "old-fashioned looking" black leather briefcase (attache case) on the floor behind the passenger seat, which Sergeant McCaw believed did not fit with a younger person, such as Lewis. During their exchange, Sergeant McCaw noticed that Lewis was short with his answers and avoided making eye contact. Sergeant McCaw obtained Lewis'

3

license and registration and returned to his patrol car. He conducted a LEIN search and determined that Lewis' license was valid and that no warrants were pending. Based upon his suspicion of drug activity, Sergeant McCaw called canine officer Randy Adams and requested him to come to the scene for backup and to perform a dog-sniff of Lewis' vehicle, if necessary.

After contacting Officer Adams, Sergeant McCaw returned to Lewis' vehicle to ask Lewis if he had anything illegal in the car and to ask for consent to search the vehicle. Lewis denied possessing any illegal contraband and refused to give consent. Sergeant McCaw returned to his patrol car to wait for Officer Adams to arrive. Less than five minutes later – about 18 minutes after the initial stop – Officer Adams arrived on the scene with Baron, the drug dog. While Officer Adams waited with Baron near the front of Sergeant McCaw's patrol car, Sergeant McCaw approached Lewis' vehicle and asked Lewis to exit in order to permit Officer Adams to perform the dog sniff. Lewis refused to do so, and Sergeant McCaw forcibly removed Lewis from the vehicle and placed him under arrest for hindering and opposing a police officer.[1] Sergeant McCaw searched Lewis and found a digital scale with white powder residue, a plastic baggy with one corner ripped out, and $369 in cash. With Lewis secured in the patrol car, Officer Adams ran Baron around Lewis' car, beginning at the front on the right side. When the dog reached the driver's-side door, it became excited and leapt into the car through the open window. The dog alerted on the briefcase and then on the center console and ashtray. The ashtray contained marijuana blunts. A baggy of white powder, which field-tested as cocaine, was found in the center console. Officer Adams searched the

---

[1] Sergeant McCaw testified that it is standard procedure to remove the driver and any passengers from a car prior to performing a dog sniff because having a person in the car would inhibit the dog sniff and, given the aggressive nature of such dogs, could be dangerous to anyone in the car.

4

briefcase and found plastic baggies containing approximately 49.3 grams of cocaine, 193.2 grams of marijuana, and 9.6 grams of heroin.

Following the arrest, Lewis was charged in state court with various drug offenses based on the arrest. A federal grand jury subsequently indicted Lewis for the same incident. On March 21, 2005, while Lewis was released on bond, officers from the Michigan State Police Metropolitan Enforcement Team were conducting surveillance on another individual, Justin Noordyke. The officers followed Noordyke into the parking lot of a Meijer store and observed him engaging in what appeared to be a drug transaction with an individual in a white Pontiac Grand Prix. Officers stopped Noordyke's vehicle and the white Grand Prix after they left the Meijer lot. The officers identified the driver of the Grand Prix as Lewis and arrested him on the outstanding federal arrest warrant. During a search incident to the arrest of Lewis, an officer found a bag of marijuana, $265 in cash, and three cell phones.

On March 22, 2005, DEA Task Force Officer Michael Mesman submitted an application and affidavit for a federal warrant to search 7146 Lodge Pole Drive S.E. in Grand Rapids for evidence of drug activity. Based upon the facts set forth in the affidavit, Magistrate Judge Brenneman issued a search warrant. During the search of the premises, officers found additional evidence of drug trafficking, including a digital scale; multiple bottles of substances used to mix controlled substances; various documents with Lewis' name on them, including bank records, phone records, utility records, and Western Union records; quantities of heroin, marijuana, and cocaine; over $7,000 in cash; and a .380 caliber 9 mm handgun.

<u>Discussion</u>

**I.     Motion to Suppress Evidence Seized on February 17, 2005**

In his first motion, Lewis argues that the evidence seized following the February 17, 2005, traffic stop must be suppressed because Sergeant McCaw did not have a reasonable suspicion to detain Lewis beyond the completion of the traffic stop and the LEIN check.  The Fourth Amendment preserves the right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment permits a police officer to make a pretextual traffic stop so long as the police officer has probable cause to believe that the driver has violated a traffic law or regulation.  See <u>Whren v. United States</u>, 517 U.S. 806, 817-18, 116 S. Ct. 1769, 1776 (1996).  "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."  <u>United States v. Ferguson</u>, 8 F.3d 385, 391 (6th Cir. 1993) (en banc).  Once the officer has completed the initial purpose of the stop, however, the detention cannot continue "unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."  <u>United States v. Hill</u>, 195 F.3d 258, 264 (6th Cir. 1999).

In determining whether an officer had a reasonable, articulable suspicion to support further detention, the Sixth Circuit examines the "totality of the circumstances."  <u>United States v. Smith</u>, 263 F.3d 571, 588 (6th Cir. 2001).  That is, a court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately."  <u>Id.</u>; see also <u>United States v. Townsend</u>, 305 F.3d 537, 542 (6th Cir. 2002) ("We are charged to determine whether the *combination of factors*

6

considered by the officer is sufficient for reasonable suspicion."). Reasonable suspicion requires "something more than an 'inchoate and unparticularized suspicion or "hunch."'" United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968)).

Lewis does not contest the validity of the initial stop, nor does he argue that the time between the completion of the traffic stop and the time that Officer Adams arrived with the drug dog was unreasonable, such that it ripened into an arrest requiring probable cause. His argument is simply that Sergeant McCaw lacked a reasonable basis to detain him for a dog sniff. This argument is without merit.

Lewis contends that the instant case is comparable to United States v. Smith, 263 F.3d 571 (6th Cir. 2001). In that case, an officer stopped the defendant's car at approximately 4:30 a.m. after observing the car cross onto the shoulder twice. When the officer approached the vehicle, the defendant immediately handed him a rental agreement for the car. The rental agreement listed the defendant's wife but did not list either the defendant or the passenger as an authorized driver. The officer noticed the passenger raise his reclined seat to the upright position and also noticed that the passenger appeared to be stoned and had a white mucus substance around his lips. The passenger said that he just woke up. The officer noticed several food wrappers and drink cans on the floor and a cooler on the back seat. He also smelled body odor, as if the men had not bathed in a couple of days. The defendant said that he and the passenger had been on a trip to Arkansas to look at a car hauler. After the officer returned to the defendant's vehicle to issue a warning citation to the defendant, the officer asked the defendant if they had any weapons or narcotics in the vehicle, and the defendant responded in the negative. The officer testified that at this point the defendant

appeared nervous and avoided eye contact when responding.  The officer asked for consent to search the vehicle, but the defendant refused.  The officer then asked both occupants to exit the vehicle so that he could run his drug dog around the vehicle.  The occupants exited the vehicle and the officer conducted the dog sniff.  The dog alerted in the areas of the driver's and passenger's doors, leading the officer to find drugs, a gun, and other evidence of drug dealing inside.  The defendant was arrested and indicted for various drug offenses.  The district court granted the defendant's motion to suppress on the basis that the officer did not have a reasonable and articulable suspicion to detain the defendant beyond the completion of the traffic stop.

On appeal, the Sixth Circuit examined the nine factors that the government cited in support of a finding of reasonable suspicion and concluded that the district court did not err in granting the motion.  The court noted that four of the factors related to the defendant's nervousness.  See 263 F.3d at 591.  It observed that while nervousness is a factor that may be considered, there was nothing "inherently suspicious" about the defendant's presentation of the rental agreement or his initial nervousness during the traffic stop, which occurred at approximately 4:30 a.m.  See id.  As for the defendant's nervousness and change in demeanor during the questioning about narcotics and weapons, the court found that these factors carried more weight in the analysis.  See id. at 592.  With regard to the rental agreement, the occupants' travel plans, and the occupant's appearance as "stoned," the court found that these circumstances were not suspicious because the officer apparently accepted the defendant's explanation at face value and failed to investigate these circumstances further.  Thus, these circumstances provided little support for a reasonable suspicion.  See id. Finally, the court found that the smell of body odor and the cleanliness of the interior of the vehicle "are factors which may indicate perfectly innocent behavior and cannot, standing alone, serve as the

8

grounds for reasonable suspicion." Id. at 593.  The court found that the totality of all the circumstances failed to support a reasonable suspicion:

> Viewing these factors in the totality of the circumstances, we conclude that Officer Fulcher did not have a reasonable, articulable suspicion of criminal activity sufficient to detain Steven Smith after the completion of the initial traffic stop. Although the government presented several factors which could, under different circumstances, and in combination with other factors, support a finding of reasonable suspicion, under the facts of this case, they merit little, if any, weight in our analysis.

Id. at 594.

This case is vastly different from Smith, because the only circumstances supporting the officer's asserted reasonable articulable suspicion in that case were the defendant's initial nervousness, his change in demeanor and apparent nervousness during the questioning about drugs and guns (which was only minor in degree when compared to evidence of nervousness in other cases), and two fairly innocuous circumstances – body odor and trash in the vehicle.  Those factors, alone or in combination, were not enough to permit the officer to continue to detain the defendant for the dog sniff.  In contrast, while nervousness was a factor in Sergeant McCaw's decision to detain Lewis, there were other, more significant factors in the reasonable suspicion calculus.

First, Sergeant McCaw observed Lewis' vehicle at a known drug house at an unusual time of the morning, parked toward the rear of the driveway with its lights on, and the vehicle left a short time later.  While an individual's presence at a known drug house or high crime area is not alone sufficient location of a criminal activity, it is "among the relevant contextual considerations in a Terry analysis." Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000); see also United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S. Ct. 2574, 2582 (1975) (noting that "[o]fficers may consider the characteristics of the area in which they encounter a vehicle" when formulating

reasonable suspicion); <u>United States v. Perkins</u>, 363 F.3d 317, 321-22 (4th Cir. 2003) (noting that the officer's familiarity with the high crime and drug trafficking nature of the neighborhood and his awareness that the particular duplex was under investigation for drug activity were important factors in the reasonable suspicion analysis); <u>United States v. Carthorn</u>, No. 93-6593, 1994 WL 487336, at *4 (6th Cir. Sept. 8, 1994) (per curiam) (concluding that the officer was aware of specific and articulable facts which supported a reasonable suspicion, including, among other things, that the officer observed the defendant in the back seat of an automobile parked in a known drug area in front of a known drug house at 4:00 a.m. and that the officer had made previous arrests at the same location); <u>United States v. Brown</u>, No. CR05-73-S-EJL, 2005 WL 2847434, at *5 (D. Idaho Oct. 26, 2005) (facts supporting reasonable suspicion to detain the defendant for a drug dog sniff included "the fact that the Defendant was first observed driving away from a known drug house very early in the morning"). In addition, courts have recognized that the lateness of the hour is an appropriate consideration in the determination of reasonable suspicion. See <u>United States v. Brown</u>, 334 F.3d 1161, 343 (D.C. Cir. 2003) (stating that the fact that the stop occurred in a high crime area "is further compounded by the lateness of the hour"); <u>United States v. Samaguey</u>, 180 F.3d 195, 198 (5th Cir. 1999) ("Although traveling at an usual time of day alone may not give rise to a reasonable suspicion, it is a permissible consideration."); <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993) (noting that "[t]he lateness of the hour is another fact that may raise the level of suspicion"). Moreover, the circumstances were consistent with prior tip information – that 144 44th St. S.W. had drug traffic at all times of the day and night and that customers used the back door – and the fact that the parked vehicle had its lights suggested a short visit, indicative of drug dealing.

10

Second, during the stop, Lewis gave information to Sergeant McCaw regarding his destination that was inconsistent with common sense. That is, Lewis stated that he was heading home, but he was traveling in the opposite direction (west) of the home address that he gave to Sergeant McCaw. Sergeant McCaw knew that 950 Woodfield East Drive S.E. was located southeast of 144 44th St., S.W. Suspicious statements, such as Lewis made, "may give rise to reasonable suspicion of criminal activity." Smith, 263 F.3d at 592. Although Lewis' counsel suggested at oral argument the possibility that Lewis was simply taking a more circuitous route home that morning, the Government has shown through its supplemental briefing that Lewis passed up several opportunities to turn south before reaching U.S. 131 and that Lewis obviously never intended to travel south on U.S. 131 because he did not travel into the left turn lane for southbound traffic.

Third, Lewis stated during the stop that he was visiting his friend, Paula. While this information alone would not suggest criminal activity, given Sergeant McCaw's prior knowledge that Paula Nice lived at and sold drugs from the residence, it served to strengthen the suspicion that Lewis had engaged in a drug transaction and that Paula Nice was still engaging in the sale of drugs.

Fourth, Sergeant McCaw observed an "old-fashioned" hard-sided briefcase in the back seat of Lewis' vehicle. Sergeant McCaw testified that the briefcase had locks on it and that he found it odd that a younger person such as Lewis would be carrying an older-style briefcase. Considered alone, Lewis' possession of an "old-fashioned" briefcase, would not give rise to a reasonable suspicion of criminal activity because it is entirely possible that a younger person, such as Lewis, may prefer to carry his personal or business papers or things in a hard-sided case, as opposed to a soft-sided case. However, when considered along with the other circumstances known to Sergeant McCaw, the briefcase provided an additional basis for suspecting criminal activity. See Perkins, 363

11

U.S. at 321 (noting that "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together").

Finally, Sergeant McCaw noticed that throughout the traffic stop, Lewis was very short with his answers and avoided eye contact, indicating that he was nervous. A defendant's nervous demeanor is one factor that may be considered in determining whether the circumstances gave rise to a reasonable suspicion. Smith, 263 F.3d at 591.

Given the foregoing circumstances, the Court concludes that Sergeant McCaw had a reasonable and articulable basis for suspecting that Lewis was engaged in criminal activity that provided justification to detain Lewis for a short period of time (no more than five minutes) in order to conduct a dog sniff of Lewis' vehicle. The Court finds support for this conclusion in the Sixth Circuit's recent decision in United States v. Davis, __ F.3d __, Nos. 03-1451, 03-1621, 2005 WL 3108503 (6th Cir. Nov. 22, 2005), which was factually similar to this case in certain material respects. In Davis, the DEA was investigating a drug trafficking operation between Chicago and Detroit. Investigators suspected Keith Presley of being a large cocaine supplier and key participant in the operation. On April 28, 1999, at approximately 6:45 p.m., police officers stopped the defendant's car for speeding as he traveled east on Interstate 94 after leaving the Chicago area. Shortly before the stop, investigators observed the defendant meeting with Presley. The investigators also observed two economy-size detergent boxes near the defendant's car during the meeting. Four months prior to the stop, the investigators had stopped several people after they were observed meeting with Presley. During those stops, the investigators found substantial amounts of cocaine in the vehicles. Based upon evidence obtained during the stops, investigators executed a warrant on

a building and discovered a repackaging operation for narcotics which used, among other things, economy-size laundry detergent boxes.

During the stop of the defendant, an officer gave the defendant a warning for speeding and asked the defendant for consent to search his vehicle. When the defendant refused to give consent, the officer told the defendant that he could not move his vehicle because the police were waiting for a drug-sniffing dog to be brought to the scene. The canine officer arrived with the dog at approximately 7:15 p.m and walked the dog around the defendant's vehicle. The dog showed some interest in the rear hatch of the vehicle but failed to alert positively. The canine officer informed the other officers of the results of the search at approximately 7:30 p.m. At approximately 7:20 p.m., a DEA agent arrived on the scene and took charge of the investigation. It was not clear whether the DEA agent was aware that the officers had already used a dog on the defendant's vehicle, but the DEA agent called for another dog. The second dog arrived on the scene approximately one hour later and alerted to the rear hatch of the car. Based on this positive result, the officers obtained a warrant to search the vehicle and found over $700,000 in two detergent boxes and another box.

The district court denied the defendant's motion to suppress the evidence obtained in the search. On appeal, the Sixth Circuit reversed. The majority opinion reasoned that the officers did not have probable cause to search for drugs, and once the first drug-sniffing dog failed to alert on the defendant's vehicle, the officers' suspicion that the defendant possessed drugs was dispelled and there was no basis to continue to detain the defendant. Id., slip op. at 8.[2] In its analysis, however, the majority concluded that the officers had probable cause for the initial traffic stop and that the

---

[2]Because publication pages are not available in the Westlaw version of the case at this time, the Court cites the Sixth Circuit slip opinion.

officers had reasonable suspicion to detain the defendant for the additional thirty to forty-five minutes for the police to bring the first drug dog to the scene and have the dog sniff for the presence of drugs. Id. at 6-7. With respect to the existence of reasonable suspicion, the majority found that the officers could reasonably believe that the defendant possessed drugs because shortly before the stop, the police had observed the defendant meeting with Presley, a suspected drug dealer. Id. at 7. The court noted that "[p]ast experience indicated to the investigators that individuals who met with Presley were likely to be in possession of large amounts of narcotics." Id. In addition, the officers had observed economy-size laundry detergent boxes, similar to those discovered in the narcotics repackaging operation, near the defendant's vehicle, and the defendant's direction of travel as well as the Michigan license plates on his car suggested that the defendant was involved in transporting narcotics in his vehicle. Id. Finally, the court concluded that the delay of approximately thirty-five minutes after the completion of the traffic stop to wait for the arrival of the drug-sniffing dog was not unreasonable. Id.

Similar to the circumstances in Davis with regard to reasonable suspicion for the first dog sniff, in this case, immediately before the traffic stop, Sergeant McCaw observed Lewis at a known drug house. Sergeant McCaw knew, based upon numerous tips that he had personally received and information obtained by other officers, that the residents had been dealing drugs from the house. In fact, Nice herself had previously admitted to selling drugs. The circumstances Sergeant McCaw were consistent with the prior tip information and drug dealing in general: Lewis' vehicle was parked toward the back of the driveway with its lights at an unusual hour. Moreover, Lewis' statement that he was visiting his friend Paula provided an additional tie to drug dealing, and Lewis' inconsistent statement about where he was going, his nervousness, and the presence of a briefcase that did not

14

fit with Lewis' appearance served to add the suspicious circumstances already existing when Sergeant McCaw stopped Lewis' vehicle. Finally, in light of the length of detention in <u>Davis</u>, the Court concludes that the five minute delay while waiting for Officer Adams to arrive at the scene with the drug dog was not unreasonable.

Although not raised by Lewis in his motion, at the evidentiary hearing, the Court raised the issue of whether the validity of the search was somehow tainted because Baron, the drug dog, leapt through the open window of Lewis' vehicle. In light of <u>United States v. Reed</u>, 141 F.3d 644 (6th Cir. 1998), which held that a dog's instinctive reaction to the odor of contraband does not violate the Fourth Amendment, <u>see</u> <u>id.</u> at 650, the Court concludes that there was no Fourth Amendment violation. The evidence presented at the evidentiary hearing established that the driver's side window of Lewis' vehicle was down when Officer Adams began to walk Baron around the car and there was no indication that either police officer put the window down. Thus, the fact that Baron entered the car on his own does not implicate the Fourth Amendment. <u>See</u> <u>United States v. Stone</u>, 866 F.2d 359, 364 (10th Cir. 1989) (finding no Fourth Amendment violation where there was no evidence that the police asked the defendant to open his car so that the drug dog could jump in or that the dog handler encouraged the dog to jump in). Accordingly, this motion will be denied.

## II.     Motion to Suppress Evidence Seized From 7146 Lodge Pole Drive

In his second motion, Lewis requests that the Court suppress evidence that was seized during the search of 7146 Lodge Pole Drive. Lewis argues that suppression is required because Officer Mesman's affidavit in support of the warrant was insufficient to establish probable cause. Lewis appears to contend that there are insufficient facts in the affidavit to link Lewis' drug dealing activities to the residence. Lewis bears the burden of establishing that the affidavit was insufficient

15

to support the issuance of the warrant. See United States v. Blakeney, 942 F.2d 1001, 1015 (6th Cir. 1991).

To meet the probable cause requirement, an affidavit in support of "a search warrant need not establish beyond a reasonable doubt that incriminating evidence will be found on the premises to be searched." Blakeney, 942 F.2d at 1025. However, probable cause does require a "substantial basis" for concluding that evidence of a crime will be found at the location to be searched. See id. (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)). Both the Supreme Court and the Sixth Circuit have emphasized that a magistrate's probable cause determination is entitled to "great deference" by reviewing courts. United States v. Leon, 468 U.S. 897, 914, 104 S. Ct. 3416 (1984); United States v. Pelham, 801 F.2d 875, 877 (6th Cir. 1986). A magistrate's determination of probable cause should be upheld so long as the magistrate had a "substantial basis" for concluding that the search would lead to evidence of a crime. Pelham, 801 F.2d at 877-78.

The "totality of the circumstances" test set forth by the Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983) governs the sufficiency of an affidavit. The Court stated in that case that

> [t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and 'basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Gates, 462 U.S. at 238, 103 S. Ct. at 2332.

In support of the warrant application, Officer Mesman provided the following details in his affidavit:

1.      His background and experience in drug trafficking investigations in general, and his involvement with the specific investigation of an organization suspected of supplying heroin teenagers and young adults in the Grand Rapids area.  Officer Mesman indicated that records and information received from various sources showed that Lewis was a heroin supplier.  (Aff. ¶¶ 1-3.)

2.      Information received from a confidential source who supplied names, residences, and descriptions of cars driven by drug traffickers which, upon further corroboration, proved to be reliable.  In particular, the informant identified Lewis a/k/a "Tess" as a drug trafficker in the Grand Rapids area.  The informant said that he/she purchased marijuana and heroin from Lewis on a regular basis since January 2004; that he/she purchased ½ or 1 gram quantities of heroin from Lewis on each occasion; that Lewis resided at an apartment complex located on the north side of 72nd street just east of Division avenue; that the informant met Lewis in the parking lot on several occasions to make heroin transactions; and that Lewis frequently drives a silver vehicle and a vehicle similar to a maroon Dodge Stratus.  (Id. ¶¶ 4-5.)

3.      The details of the February 17, 2005 traffic stop and arrest of Lewis, who was driving a maroon 1998 Plymouth Breeze, which is similar to a Dodge Stratus.  Officer Mesman also related the details of the drugs and the gun found in the car.  (Id. ¶ 7.)

4.      Officer Mesman's trips to the complex in which 7146 Lodge Pole Drive S.E. is located to confirm the informant's information.  Officer Mesman observed a silver Pontiac Grand Prix and a maroon Plymouth Breeze parked next to each other in front

17

of 7146 Lodge Pole Drive.  Officer Mesman observed that the vehicles were backed in, so as to conceal the license plate numbers.  (<u>Id.</u> ¶ 7.)

5.      The details of the March 21, 2005, surveillance of Justin Noordyke, including the apparent drug transaction between Noordyke and Lewis, as well as the subsequent arrest of both participants.  In the interview following the arrest, Noordyke said that he had met with his source, "Tess," and had purchased crack cocaine and heroin from "Tess."  Noordyke stated that "Tess" was the person driving the white Pontiac Grand Prix (whom other officers arrested and determined to be Lewis).  (<u>Id.</u> ¶¶ 8-9.)

6.      Lewis' statements in connection with the February 17 and March 21, 2005, arrests, in which Lewis gave 950 Woodfield Drive Apt. #3 and 4731 Walma Ave #102 as his residences and denied having any other residences.  Officer Mesman also stated that pursuant to an administrative subpoena, West Michigan Property Management produced a lease agreement between Pine Circle Townhouses and Jerome Lewis and Starr King for 7146 Lodge Pole Drive, with a term of May 1, 2004, through April 30, 2005.  Officer Mesman also stated that Lewis told him that he had two children by Starr King and that she and the children lived at some unknown address in Newaygo.  (<u>Id.</u> ¶¶ 10-12.)

Given the substantial facts set forth in the affidavit, Lewis' argument that the affidavit lacks sufficient facts to support probable cause is without merit.  The affidavit provides a substantial basis to conclude that evidence pertaining to Lewis' drug dealing activities would be located at the Lodge Pole residence.  To the extent that Lewis asserts that there is no indication that the confidential informant is reliable, or that the information given by the confidential informant is insufficient, there

is plenty of information in the affidavit to corroborate the informant's information.  For example,

Officer Mesman himself confirmed the description of the two vehicles given by the informant.

Similarly, the description of the vehicle Lewis was driving on February 17 confirmed the informant's

description of Lewis' vehicle, as well as the fact that Lewis was continuing to engage in drug activity

through the date of the arrest.  Moreover, Noordyke's statement confirmed that Lewis was the person

whom the informant identified as "Tess."  With regard to the connection to the Lodge Pole address,

the lease confirmed that Lewis had a connection with that residence.  In addition, Officer Mesman

stated that it was his experience that drug dealers often maintain several residences and would

conceal the location of a residence used as a "safe house."  Finally, because the arrest on February

17 was valid, there is no basis for excluding that information from the affidavit.

      Lewis also contends that there is an issue under the Supreme Court's decision in Franks v.

Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), in which the Court held that a

> defendant who makes a preliminary showing that a false statement knowingly and
> intentionally, or with reckless disregard for the truth, was included by the affiant in
> the warrant affidavit, and if the allegedly false statement is necessary to the finding
> of probable cause, the Fourth Amendment requires that a hearing be held at the
> defendant's request.

Franks, 438 U.S. at 155-56, 98 S. Ct. at 2676.  The search warrant must be voided and the fruits of

the search excluded only where the defendant establishes his allegations by a preponderance of the

evidence and the remaining content is insufficient to establish probable cause.  See id. at 156, 98 S.

Ct. at 2676.  The Sixth Circuit has held that a defendant who challenges the veracity of statements

made in an affidavit is entitled to an evidentiary hearing only if he points to the specific statements

that he claims are false and supports his allegation with an offer of proof, including supporting

affidavits (or explains why they are not available).  <u>United States v. Cummins</u>, 912 F.2d 98, 101 (6th

Cir. 1990)(quoting <u>United States v. Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990)).

Lewis' <u>Franks</u> argument is without merit because Lewis has failed to make a threshold

showing that any statement in the affidavit was false.   Apart from that shortcoming, Lewis has failed

to show that Officer Mesman knowingly and intentionally included false information in the affidavit.

Accordingly, Lewis has failed to demonstrate any basis for a <u>Franks</u> hearing, and the Court will also

deny this motion.

<u>**Conclusion**</u>

For the foregoing reasons, the Court will deny Lewis' motions to suppress.

An Order consistent with this Opinion will be entered.

Dated:  December 27, 2005                               _____/s/ Gordon J. Quist_____
                                                                          GORDON J. QUIST
                                                          UNITED STATES DISTRICT JUDGE